Move to the second case this morning, David Davin Green v. Jonathon Newport. Good morning. Good morning. Just wait just a second. Thank you. May it please the court, counsel. My name is Patrick McLean. I'm an assistant city attorney for the city of Milwaukee and today it is my privilege to represent Milwaukee Police Officer Jonathon Newport on this appeal. While the magistrate judge's decision and order which resulted in the denial of qualified immunity for Officer Newport had a number of problems, because we have such a short time today, I'm going to focus on the second prong of qualified immunity and the misapplications of law that resulted in the denial of qualified in explanation or giving your view as to what the factual predicate is of Newport's request for qualified immunity. What facts do we look at in the summary judgment record? Absolutely. And that is obviously a point of contention in this case for two reasons. First because the magistrate judge did not particularly, excuse me, specifically elucidate those facts and because Green has gone through great efforts to try and remove some of those facts from the record. However, when you look at the factual record, you will see that the majority of the facts and all of the facts presented on appeal are in fact undisputed. On November 26, 2014, at approximately 8.30 p.m., a 911 call was placed from an O'Reilly auto parts store reporting that a Mercury Grand Marquis had circled the parking lot approximately five times. Milwaukee Police Officer Jonathan Newport was dispatched to the location. Now the 911 call was particularly concerning for Officer Newport for a number of reasons. The first of which was that the time of the 911 call coincided with, was close in time to the time the store was closing and based on Officer Newport's training and experience and familiarity with the store, he knew that that is the time when cash would be moved around the store and in his words, in his suppression hearing testimony, that would be the perfect time for robbery. Also important was the fact that Officer Newport was aware at this time that the auto parts store in question had recently been the victim of an armed robbery approximately eight weeks prior and that that armed robbery had involved individuals armed with firearms. Let's fast forward to the time when the officer gets into the parking lot and encounters the Absolutely. Because we're up on an interlocutory appeal related to qualified immunity, we have to take the facts most favorable to green. When Officer Newport arrives, he observes the Mercury Grand Marquis is now parked in a parking space in the middle, to the right in the middle of the three rows in the parking lot. The Mercury Grand Marquis has also been joined by another vehicle, a Chevy Malibu, in which plaintiff appellee Devin Green is seated in the driver's seat. According to Green, and this is contested but because we're on a qualified immunity appeal, Green asserts that Joseph Lindsay was standing in the back of the Mercury Grand Marquis rather than in between the vehicles. However, the location of the vehicles was important to Officer Newport for two reasons. One, the fact that the two vehicles were parked together and oriented in the same direction with Green still seated in the passenger seat, and the suspicious vehicle having recently parked allowed Officer Newport to draw the reasonable inference that the two vehicles had recently rendezvoused. More importantly, considering all of the facts that Officer Newport was aware of about the location, the history of armed robbery at the location, the rash of armed robberies throughout Milwaukee at that time, the 911 call reporting suspicious activity, the location and orientation of the vehicles was telling to Officer Newport because it corresponded and further raised his suspicion that he was responding to a potential casing situation. And those essentially are the facts of what Officer Newport observed when he arrived at the location. For the purposes of this... So for summary judgment, it is for purposes only. It is not a fact that Lindsay reached into or leaned into Green's car? Correct, for the purpose of this appeal. So turning back to the errors made by the magistrate judge, which ultimately resulted in the denial of qualified immunity, there are two major mistakes that the magistrate judge made. The first is that he too narrowly defined the right supposedly violated here by failing to take into account factual considerations and defining the right in the context of those factual considerations. Because of that, the district court made a second mistake and erroneously found that that right was clearly established based on case law. However, the case law cited by the magistrate judge was simply factually too dissimilar to the situation confronting Officer Newport to be of any use in qualified immunity. So taking those two mistakes in order, the magistrate judge defined the right supposedly violated as the right to be free from unlawful search and seizure based only on a 911 call of suspicious activity with nothing more. However, this court just last year in Williams v. Indiana State Police Department clearly stated and admonished district courts to ensure that you don't commit exactly that mistake. This court said that in cases like this, the right supposedly violated must be defined as the right to be free from unlawful searches and seizures under the relevant circumstances of the case. And we know based on the facts that there are far more relevant circumstances than just a 911 call reporting suspicious activity. I just enumerated those so I won't go through them again, but that was the magistrate judge's first clear mistake in determining the right supposedly violated by not taking into account all the other factual circumstances which were applicable in this scenario. Moving on to the second step of the two-step process for the second prong of qualified immunity, the district court was then forced to ask whether existing precedent would have placed Officer Newport on notice that his actions were unlawful. Again, in Williams v. Indiana State Police Department, which itself was guided by a Supreme Court decision that was decided just a few months before Williams, city and county of San Francisco v. Sheehan, both of those cases stand for the premise that the existing precedent question, for the purpose of the existing precedent question, the case law asserted by either the district court or the parties seeking to defeat qualified immunity must have been sufficiently factually similar to the situation at issue in order to defeat qualified immunity. In other words, if a case is too dissimilar, or as the Supreme Court put it, a bad fit for the facts that were confronting the officer in the particular case, then it simply is inapplicable for qualified immunity as a justification to deny immunity to an officer. But isn't there precedent holding that mere proximity to somebody who is suspicious is not sufficient in and of itself to give rise to reasonable suspicion? There is existing precedent to that effect, but we have more than that in this case. In the context of the circumstances that Officer Newport is relying on as he's approaching the scene, for example, he knows that this location was recently the subject of armed robbery by multiple male subjects armed with firearms. Furthermore, he knows that he's responding to a 911 call reporting suspicious activity, and he knows that a rash of robberies have been occurring in the area, all involving multiple male subjects using firearms. So when he responds to the scene, that context shapes his viewing of the situation. He already knows that it would be reasonable for him to assume there might potentially be more than one subject. And when he arrives on the scene, he sees two vehicles that are not just in close proximity, but are oriented in such a way as to be consistent with what he already reasonably believes to be happening, which is the potential that this is a casing for It is a Terry stop. No. And in fact, it's very similar to the logic that was applied in Terry, which when you look at the case I'm going to talk about, United States v. Riley, relied a lot on the exact same kind of logic as was relied on in Terry. And that's where the district court really made a big mistake here, was it basically conducted the same type of library analysis by scholars that the Supreme Court has warned against, rather than looking at what could be otherwise innocently interpreted actions of a suspect, but when taken together and viewed through the lens of a trained police officer, amount to reasonable suspicion, considering the totality of the circumstances in the situation. To go back to the second part of the second prong of qualified immunity, this is really where it becomes black and white that Officer Newport is entitled to qualified immunity. It is the burden of the party seeking to defeat qualified immunity to point to some case which is factually similar enough to the case at hand that would have given the officer notice that his actions were unlawful. And I'll quote this court from Williams, which was itself interpreting Sheehan, Sheehan thus cautions against interpreting the clearly established law requirement too broadly and substituting general propositions of law for cases that are factually similar enough to apprise the officers of the contours of the constitutional protections due in the situation. When you look at the case law presented both by the situation, none of those cases involve interpretation of innocent behavior, which taken together amounts to casing type activity. And that's precisely the type of case that is required to defeat qualified immunity. Now I won't go into those cases because they were contained in the brief and we have a short time here, but I think it's telling that when you look at the case of United States v. Riley, which I don't think anyone would dispute is factually more similar to this case than any of the cases cited by the magistrate judge or Green, you reach the conclusion that the exact type of observations made by officer Newport here have been found by this circuit to amount to reasonable suspicion. You're in your rebuttal time, do whatever you want to. Thank you. I'll just finish briefly. And so because cases like Sheehan and cases like Williams require the case to be similar factually, so it would be sufficient to put an officer on notice that his actions were in violation of the law. The cases cited by both Green and the magistrate judge are simply insufficient to defeat qualified immunity because quite frankly, factually, they have nothing to do with this case. And it's quite telling that United States v. Riley, which is the closest factual scenario to the case at issue, was only cited by appellant. And that's because when you look at that case, it's clear that not only would officer Newport not have been aware that his actions clearly violated the law, but instead he would have reasonably believed that he was taking lawful actions. And I will reserve the rest of my time for rebuttal unless anyone has any questions. Thank you, counsel. Mr. Sultan. Good morning, Your Honors. May it please the court, I am William Sultan, and I represent the plaintiff of Pele, Davin Green. Being ordered to stop, to put your hands up in the air, being told to exit your car, and having a police officer run his hands up and down your body as passersby gawk at you is not a petty indignity. Does it have a smack of a Terry stop to you? Is this a Terry stop? I believe the, I mean, that's the officer's claim that he was stopped. Well, how would you describe what he did? I would describe it as the officer simply violating the Fourth Amendment. He's investigating a complaint. He's looking to see whether the complaint has, these people are suspicious. Was there anything unsuspicious about their activity? Yes, and I'd point out that nowhere in the record will the court find Officer Newport citing anything suspicious that Green did. What he's talking about is transferring the suspicion from another person. Well, we've got those two, there wasn't anybody else in the parking lot, were there? Other cars? The record is, there's nothing in the record that says that they're the only two. No, what the record shows is we've got two individuals at closing time, one had been cruising the area, get together at the same time, right? No, Your Honor, what we have is we have a report of one car. I know, one car was cruising. Circling a parking lot about five times, an officer then arriving at the parking lot and seeing two cars, one car in which he says is the Mercury Grand Marquis, which was called about, he says he sees another man standing in between the two cars on the passenger side of the Chevy Malibu, Mr. Green's car, and that based on that fact and some of the... And if you were an officer, what would you have done? I'm not a police officer. Just sit back and watch? I think there are a couple of things. Whether or not Officer Newport could have lawfully stopped Mr. Lindsey is separate and apart from what he could do to Mr. Green. But even if the court is convinced that he could have stopped Mr. Green, we're talking a matter of seconds before Mr. Green is ordered out of his car and frisked. And there's nothing in the record that I think would allow Officer Newport to reasonably believe that Green is a robbery suspect, that he's an aider and a better of the Mercury Grand Marquis. And I'd also point out, as we pointed out to the district court, that I don't even believe it's reasonable to assume that Mr. Lindsey is in fact the driver of the Mercury Grand Marquis. He's not in the Mercury Grand Marquis. This is an officer that testified that there was no specific reason for why he did what he did. This is an officer who testified that he didn't know anything about the common traits of robberies in the city. My question gets back to what would you have done? I think the officer could have lawfully approached both of these men and had a voluntary encounter with them without conducting a Terry stop. Like what? Hello, fellas. What are you doing? Like officers do all the time, Your Honor. Officers all the time... Oh, no, wait a minute. Sir. That's what you do. You just... You presume that there's nothing going on. Is that what you want him to do? I didn't... I'm not suggesting that the officer should presume that nothing's going on. All right. What I'm asking... What does he do to investigate what he is called upon to do to investigate? The officer could have... Ask him. The officer could have approached both men and say, hey, are one of you guys the driver of this Mercury Grand Marquis? Did you drive around this parking lot? Why did you do that? And officers frequently do do that, and that does not implicate the Fourth Amendment at all. In this case, the officer activates his squad car lights, which is indicating that he's going to stop these cars because under Wisconsin law and every other state, you must stop when those lights are activated. He then shouts at these two men to put their hands up while he's got his hand on his gun, and he then is approaching Mr. Green, who the call's not even about. He's in the Chevy Malibu, and he's ordering him out of the car and frisking him. Now, one of the things we just heard from opposing counsel is that there was a rash of armed robberies in Milwaukee. That's not the testimony in the record, but even if there was a rash of armed robberies in Milwaukee... I would say no. There's not a word in there. No. What the testimony is is that the officer believed that there was a prior robbery at that store, and that generally in the city of Milwaukee... How did the officer come to believe this? I think it's an after-the-fact justification, because when the officer was asked by me at that suppression hearing transcript to describe any facts of that robbery, he had none. He testifies he doesn't know anything about those facts. He can't give me time, dates, or anything. This is not a circumstance under which this officer was comparing his observations to something that he knew. This is not like Terry v. Ohio, where you had an officer... He knows there's a car driving around, which leads to suspicions that are casing the place. Does it not? In the setting we're talking about? I don't believe so. You mean somebody rides around and around checking out things at closing time, and that's normal behavior? We're talking about two adjoining... No, no, no, no. Does that normal behavior, or does that raise a suspicion of why are you riding around looking at this at closing time? I don't believe that it raises a suspicion of casing behavior. No, I don't. Okay, you're the open-minded, non-suspicious type. No, I wouldn't say that. If you were a police officer, you might be on the alert, on the Cui Vive, which you're supposed to be, looking for things that are suspicious that should be investigated, right? That is correct. Okay. Then it's just a question of whether or not what they've seen and heard has raised that reasonable suspicion that something is afoot. That is correct. Okay. And then they should just come over and say, Folks, you don't know whether they're walking into two armed robbers. If their suspicions are correct, or his suspicions are correct, that's a possibility, isn't it? Is it a possibility that his suspicions were correct? Yeah. Well, so now he has to protect himself. He says, Get out of the car. I'm not sure that the record is that clear that the officer believed that there was about to be an armed robbery. Okay. When the officer receives this report of a 911 call, the officer doesn't activate his lights. Suspicion is like beauty in the eye of the beholder. But let's say that he's out, his job is to look out to see whether there's some suspicious circumstances and prevent crime if he can, right? Yes. And you want him not to pay any attention to this because there could be a reasonable explanation for it. No. What I'm asking is that the court apply a reasonableness standard to his conduct. And officers can do many things that are less than a Terry stop or a frisk. I'm not asking you to confess. It's your draw. Go ahead. Correct. And I understand your point. But Officer Newport didn't do anything unlawful until he stops and frisks Green. And there's nothing unusual or out of the ordinary of an officer having a voluntary conversation with a citizen. But the bottom line in this case is whether or not there was suspicion to stop Lindsey, that suspicion doesn't transfer to Green just because he's there. No, he's talking to him. Green is there at the same time closing at a place that had been robbed not too long ago. And there are two of them. And both cars were stopped, right? Yes. I don't know what you think, if you came upon that scene, what you would have done if you were a police officer. We're talking about two cars that are parked in front of a store. I understand that. But I'm talking about the time of day, the prior history of this business being robbed. Other armed robberies have similar stories. Well, let's take that example. Because, again, armed robberies generally in the city of Milwaukee tells this court nothing about this particular specific location. The one prior robbery, and we put that evidence into the record, not the defense, that prior robbery occurred at 1030 in the morning and had nothing at all to do with cars. And they had, in fact, arrested two suspects in that case. So this is not a situation where there is prior instances of robberies at closing time. Right. Going the other way, except here it's two innocent people driving around that time of night at a parking lot. We're talking about an auto parts store parking lot, which I think is significant. Auto parts stores frequently advertise to their customers that they can purchase a part and install it inside their car, inside their parking lot. Right. Not at closing time, though. This is not at closing time. It's 30 minutes before 9 o'clock. So this is not right at closing time. I don't think the evidence shows that. But, again, I think this is an after-the-fact justification by Officer Newport. I would ask the court to look at his actions before he gets there. He doesn't immediately activate his squad car lights and hurry into this parking lot. He doesn't do that until he sees Mr. Lindsey, and he claims that Mr. Lindsey leaned into Mr. Green's car, and that's what caused him to activate his squad car lights. But even if you accept that testimony, at no point in time does he say, oh, I saw him move anything, I saw something that looked like a firearm or anything like that. And even Officer Newport's testimony, when he originally goes up to Mr. Green's car, is that he asks him whether he has any weapons, and Mr. Green says no. So he does have even more information before he commits that frisk. I think under these circumstances, there just simply isn't reasonable suspicion for the stop or the frisk. I don't believe that his proximity to Mr. Lindsey by itself establishes that there's reasonable suspicion in this case. And that's why I asked Newport's counsel what more than mere proximity was there on this summary judgment record. And we don't have the leaning into the car or reaching into the car, because that's not part of the summary judgment record, because we have to construe all the facts in favor of Green. But we do have the proximity, and we have the prior armed robbery with more than one male subject. And we also have Mr. Green sitting in his car. Mr. Green wasn't coming from the store with a bag of auto parts or a box full of auto parts. He wasn't leaving his car going into the store with nothing. He was just sitting in his car next to Lindsey's car, and Lindsey was outside the car. Doesn't that give enough to provide an officer a reasonable suspicion that Green was Lindsey's confederate? No, I don't believe so. Under our facts, and again, this is a qualified immunity appeal, I point out that... And I'm agreeing with your facts. Sure. But I think it's important to note that the court did grant our motion for summary judgment, and in that way the order that's being appealed is a little bit funny. But under our facts, Lindsey is behind his car pulling a jack out of his car with a light on the ground, getting ready to jack this car up. That's what he's actually doing. He's getting ready to install brakes. That's what we're talking about. Is that in the record? That's in his declaration. And I'd also point out that, although it's not included in our short appendix, it is in the record, the entire suppression hearing transcript, Officer Bussard's testimony that he found some chicken inside of Lindsey's car, that Lindsey told him that he went to the chicken restaurant that had the drive-thru, and that's why he drove around the parking lot. They located chicken inside of his car. There is evidence from Lindsey's declaration that he's a mobile mechanic, a guy who drives around and fixes cars. So you're saying that the record reasonably construed in the light most favorable to the plaintiff has facts indicating that Lindsey was not just standing behind the marquee, but actually had a jack and was in the process of jacking up the back of the marquee. Yes. That's Lindsey's declaration. Again, that's not in our appendix. It's not cited by the district court. But that's what he's doing there. And the testimony from Officer Bussard, who was Officer Newport's partner, he's the guy that stops Mr. Lindsey and frisks Mr. Lindsey and has conversations with Mr. Lindsey about why they're there. So Newport didn't encounter or approach or deal with Lindsey? That is correct. Newport's partner did? Yes, Jesse Bussard. Is there anything in the record indicating that Newport was aware of the content of the discussion between Newport's partner and Lindsey? There's nothing in the record that indicates that he was aware of Officer Bussard's conversations with Mr. Lindsey. And I think the record is it's probably fairly construed that he was not aware of those conversations. This all happened very quickly as a matter of seconds. When he exits his squad car, he immediately approaches Green. He orders him out of the car and begins frisking Green. So there really isn't any interaction or conversation. Officer Bussard's testimony makes clear he does the same thing to Mr. Lindsey. That conversation happens much later. Without any further questions, I'll yield the balance of my time. Thank you, Counselor. I'll start by saying that I just reread Mr. Lindsey's declaration in its entirety, and nowhere in there is there any mention, nor have I ever seen anywhere in the record, any evidence that Mr. Lindsey testified that there was a jack on the ground and that he was changing a tire. It's simply not in the record. The only evidence we have for Mr. Lindsey is his declaration. It's about two and a half pages. Could you give a citation to the record, please? Yes, I apologize. No, that's okay. It is at docket 27. And like I said, it's two and a half pages. I just read it again. All it establishes was that Lindsey was at the back of the vehicle rather than in between the vehicle. Is there a pin site in docket 27, or is the docket 27 in its entirety the declaration? It is entirely the declaration. Turning next to the Green's assertion that there's no evidence in the record. But would you agree that if, in fact, there is evidence in the record that Lindsey had a jack and was jacking up his car, that would have dispelled or dissipated any suspicion that he was about to commit an armed robbery because it would make for a very bad getaway car if the back of his car was jacked up? I would say that it would contribute to an officer's consideration about whether or not there was reasonable suspicion without dispelling it altogether. Jacking up a car could be an excuse to sit in front of a store to observe the goings-on of the employees and the security or wait for patrons to leave. Again, that would have to be a decision, luckily, we're not faced with, that the officer would have to make at the time. But again, I'll reiterate that that is the first time that issue has ever been raised, and it's simply not in the record. When was the first time the issue was raised? With the jack being outside of the car? Yeah. About five minutes ago. It's never been raised at the district court level in any of the briefs. The record is totally silent on anybody talking about a jack. Correct. Bingo. Turning next to the evidence that there's no ---- Excuse me just a minute. Is that correct? I don't believe so. I don't have Mr. Lindsay's declaration. Why did you say it if you didn't have any predicate for it? I believe that isn't his declaration. Is there more than one declaration or just the one? I believe there's just one declaration. It is what it is. Yeah, I mean, it says what it says. The declaration doesn't say that. I'll apologize for the error. Okay. Thank you. And I see I'm running low on time. I will just reiterate that Green spent his entire argument arguing whether or not there was reasonable suspicion to stop and frisk Green. That, of course, goes to the first prong of qualified immunity. Green did not address at all and barely addressed in his brief the second prong of qualified immunity, which says even if there was not reasonable suspicion to stop and frisk Green, you still have to point to some case which would have put Officer Newport on notice that his actions were in violation of the law. In other words, there had to have been definitive case law that was on point such that no reasonable officer could have believed his actions to be within the bounds of the law. And when you look at the cases cited by Green and the magistrate judge, they are far too factually dissimilar. In cases like United States v. Riley, which are factually similar, evidence that Officer Newport is entitled to qualified immunity. Thank you. Thank you. Thanks to both counsel. And the case is taken under advisement. Excuse me. Before I let counsel leave, do either of you have a copy of that? Yes, Judge. Would you mind submitting that to the court? You can mail it in. Yeah. Or give it to the clerk later. Thank you.